## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

_____
)
ANNALINDA MARTINEZ, individually )
and on behalf of all others similarly situated, )
)
Plaintiffs, )
)
) **CLASS ACTION COMPLAINT**
v. ) JURY TRIAL DEMANDED
)
GEORGIA DIVISION OF FAMILY AND )
CHILDREN SERVICES; GEORGIA )
DIVISION OF CHILD SUPPORT )
SERVICES; GEORGIA DEPARTMENT ) CASE No.:_____
OF HUMAN SERVICES; )
)
Defendants. )
_____)

## INTRODUCTION

1.     Between 2018 and 2022, the state of Georgia tore apart more than 700 families, removing children for the sole reason of "inadequate housing." Essentially, the state deemed more than 700 families too poor to parent their own children, moving those children (against their parents' desire) into foster care. Paradoxically, the state then charged those same impoverished parents for the cost of foster care, despite knowing that these parents could not afford those fees, that the state would never see the money, and that unaffordable debt only delays family-reunification. This issue is not restricted to those years; in Georgia, your children can be removed from your care because you are too poor to afford housing, and the state will turn

1

around and bill you into deeper poverty.

2.      The federal government recognizes that "[i]t is almost never the case that securing an assignment of the rights to child-support is in the best interest of the child."      https://cwpm.acf.gov/citations/title-iv-e/title-iv-e-general-title-iv-e-requirements/title-iv-e-general-title-iv-e-1, 8.4C. TITLE IV-E, General Title IV-E Requirements, Child support.  Georgia itself admits that "[r]educing the income of the parent(s) could impede their ability to engage in reunification efforts, potentially extending a child's time in foster care." https://pamms.dhs.ga.gov/dfcs/cws/09-12

3.      The Georgia Division of Family and Children Services operates an unconstitutional child-support program in which the biological parents of children in foster care are charged exorbitant amounts of money with no regard for the parents' inability to pay.  Inability to pay these child-support charges results in mounting debt, threats of incarceration, delayed reunification, and the denial of the constitutional right to parent one's children.

4.      In August of 2024, recognizing the ineffectiveness of this practice and in keeping with federal guidance, the Georgia Division of Family and Children Services amended its policy to not enforce child-support where "reduced income may prevent or delay reunification."  Georgia Division of Family and Children Services Child Welfare Policy Manual, Chapter 9, 9.1, August 2024.  Unfortunately, this amended policy is only applicable to new child-support cases and does nothing

to change enforcement against indigent parents buried under child-support debts that they will never be able to repay.

5.    The previous policy has ongoing impacts; parents under the old pre-2024 policy are still not protected from exponentially increasing debt, threats of incarceration simply because they are poor, or the delays in family-reunification that may result.

6.    Despite the stated mission of the Division of Family and Children Services to "empower, strengthen, and support families on their path to independence," its policies disempower parents, weaken families, destabilize efforts for reunification, and keep families reliant on state resources by making poor families poorer.

7.    Child-support charges that lack consideration of ability to pay violate the Due Process and Equal Protection Clauses of the United States Constitution.

**PARTIES**

8.    Annalinda Martinez is a 40-year-old woman residing in Kennesaw, Georgia.

9.    Ms. Martinez has parented eight children.   She currently has custody of two of them (ages 5 and 2), three are now adults, two have been adopted (with Ms. Martinez's parental rights terminated), and one is in foster care pending adoption (with Ms. Martinez's parental rights terminated).

10.    At its highest amount, Ms. Martinez's child-support debt exceeded $13,000.  The bulk of that debt was paid with the assistance of Together With Families, a local nonprofit, but Ms. Martinez still struggles to pay her child-support.

11.    Ms. Martinez has previously received letters from the Division of Child Support Services threatening her with incarceration if her child-support remains unpaid.

12.    Defendant Georgia Division of Family and Children Services ("DFCS") is a division of Defendant Georgia Department of Human Services ("DHS") operating in all cities and counties in Georgia.  Defendant DFCS is responsible for "provid[ing] numerous support services and innovative programs to help families in need." https://dfcs.georgia.gov/about-us; https://pamms.dhs.ga.gov/dfcs/cws/09-01/; https://pamms.dhs.ga.gov/dfcs/cws/09-12/.

13.    Defendant DFCS makes recommendations to courts throughout the state in child-custody cases, advising courts as to the amount Defendant DFCS believes a parent should pay.  Defendant DFCS may also make a child-support referral absent a court order. *See* https://pamms.dhs.ga.gov/dfcs/cws/09-12/.

14.    In cases with child-support obligations, Defendant DFCS also creates and applies policies controlling enforcement of child-support orders for children in foster care. *Id.*

15.    Defendant DFCS's policymaking role with regard to enforcement of

the collection of child-support is separate and independent from courts. Due to Defendant DFCS's independent authority over the enforcement of child-support collections, Defendant DFCS is positioned to ensure that enforcement is fair and lawful. This authority also enables Defendant DFCS to enact enforcement that is arbitrary or discriminatory.

16.     Defendant Georgia Division of Child Support Services ("DCSS") is a division of Defendant DHS operating in all cities and counties in Georgia. Defendant DCSS is responsible for enforcing child-support obligations for biological parents with children in foster care and for reporting progress on child-support payments to Defendant DFCS. In other words, Defendant DFCS's policy controls whether, how, and to what extent Defendant DCSS enforces child-support, garnishes wages, and threatens incarceration. *See* https://pamms.dhs.ga.gov/dfcs/cws/09-12/

17.     Defendant DFCS refers child-support cases to Defendant DCSS for enforcement.

18.     Child-support collected through Defendant DCSS's enforcement is then transferred to Defendant DFCS and disbursed to foster families by Defendant DFCS. https://pamms.dhs.ga.gov/dfcs/cws/09-01

19.     Under the current policy, Defendant DFCS is responsible for determining when and how Defendant DCSS should enforce support orders. https://

pamms.dhs.ga.gov/dfcs/cws/09-09/

20.    Defendant DFCS has the authority to recommend selective enforcement of child-support by Defendant DCSS.  *Id.*

21.    Defendant DCSS has the authority to review and adjust child-support by request of the parent subject to payments.  Defendant DCSS's authority in this regard exists independent of courts.

22.    Defendant DHS is a department of the executive branch of the State of Georgia.  Defendant DHS "delivers a wide range of human services designed to promote self-sufficiency, safety and well-being for all Georgians."  It oversees all activities and policies of both DFCS and DCSS.  https://dfcs.georgia.gov/; https://dhs.georgia.gov/organization/about.

23.    At all times relevant to the allegations in this complaint, Defendants have acted under the color of state law, pursuant to their authority and responsibility as agencies of the State of Georgia.

## JURISDICTION AND VENUE

24.    This is a civil rights action arising under 42 U.S.C. § 1983 and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

25.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### A.    Plaintiff's History with DFCS

26.    In December 2017 and January 2018, Ms. Martinez was living in an apartment with her then-boyfriend and her six eldest daughters, all of whom were under the age of 18.  Her then-boyfriend's income paid the rent for their home. Ex. 1, Martinez Declaration, ¶¶3–6.

27.    Ms. Martinez learned that one of her daughters was being sexually abused by her then-boyfriend.   Upon discovering the abuse, Ms. Martinez immediately called 9-1-1, and her then-boyfriend was arrested at their apartment soon thereafter.  Ms. Martinez ended the relationship and testified against him in court, and he was incarcerated.  *Id.* at ¶¶ 4–5.

28.    Ms. Martinez attempted to keep her family afloat by working three different jobs, but without her former boyfriend's income, Ms. Martinez was unable to afford the rent on the apartment in which she and her daughters lived.  They were evicted in January 2018, approximately one month after she reported the sexual assault.  *Id.* at ¶¶ 6–7.

29.    Ms. Martinez did not have any nearby family or friends on whom she could rely; on the night they were evicted, Ms. Martinez and her six daughters had no other options and slept in her van.  *Id.* at ¶¶ 6, 8.

30.    After that first night, Ms. Martinez went immediately to her local DFCS

office.  She imagined and hoped that Defendant DFCS would help her find shelter for her family.  She explained her situation to the DFCS employee she met with and was told that DFCS would be happy to help her.  The DFCS employee instructed Ms. Martinez to remain in the waiting room while the DFCS staff made calls on her behalf.  *Id.* at ¶9.

31.    At the end of that day, a DFCS employee informed Ms. Martinez that her children would be sent to foster placements and that she would be responsible for finding her own housing.  DFCS did not offer Ms. Martinez a place in a shelter with her daughters, a spot on a waitlist for subsidized housing, or any other opportunity to remain with her children.  *Id.* at ¶10.

32.    The following day, Ms. Martinez spoke with several DFCS workers in an attempt to get her daughters back.  Ms. Martinez was told their decision was final and could not be reversed.  *Id.* at ¶11.

33.    Ms. Martinez was given conflicting information from Defendant DFCS regarding the requirements to have her children returned.  One DFCS employee told her that, in order to regain custody of her children, Ms. Martinez would need to secure housing that would allow each of her six children to have her own room. Another employee told her that her daughters could share rooms, but only two per room.  Neither were options that Ms. Martinez could afford without assistance.  *Id.*

34.    After removing her children, Defendant DFCS formally recommended

that she pay child-support, despite knowing that she was indigent.

35.    Although it did not specify a monetary amount, the written order from the court hearing formalizing her daughters' foster placement stated that Ms. Martinez was responsible for reimbursing "all or part of the costs and expenses incurred for the treatment, care, and support of the children including but not limited to reimbursement of foster care per diem payments made in order to secure housing for the children." Ex. 2, 2018-01-25 Cobb County Juvenile Court Order, pp. 3–4.

36.    Ms. Martinez was required to pay $100 per month for child-support until that was adjusted to her current amount in fall 2019. Ex. 1, Martinez Decl., ¶16.

37.    In October 2019, Defendants DHS and DCSS submitted a child-support worksheet to the court, recommending that Ms. Martinez pay nearly half of the income they attributed to her in child-support. The worksheet included no deviations from the standard obligation, despite Ms. Martinez living below the federal poverty limits and being homeless. Ex. 3, 2019-10-21 Child Support Worksheet, p. 1.

38.    Defendants' recommendation for Ms. Martinez's child-support states that, despite being sporadically employed and homeless, Defendants found "no special circumstances sufficient to warrant deviation from the child support table." Ex. 4, 2019-10-28 Order for Paternity and Child Support.

39.    Ms. Martinez was ordered to pay $472 every month in child-support.

This amount has not changed since and remains due every month, even at the time of this filing.  *Id.*, *see also* Ex. 1, ¶16.

40.     Ms. Martinez already had $500 in arrears when Defendants DFCS and DCSS made this recommendation in October 2019.  Ex. 4, p. 4.

41.     Despite knowing of her indigence, Defendants DFCS and DCSS continued to enforce collection of child-support from Ms. Martinez.

42.     In May 2023, with mounting child-support debt, no hope of sufficient housing, and a promise from DFCS employees that her daughters would all be adopted together, Ms. Martinez executed a voluntary surrender of her parental rights. This surrender terminated parental rights for all six of the daughters she had at the time.  Ex. 1, ¶22.

43.     Of the six daughters who were removed from her custody and to whom she surrendered her rights, three have turned 18 and left the foster care system, two have been adopted, and one has a pending adoption.  *Id.* at ¶33.

44.     Ms. Martinez's support amounts did not change following her voluntary surrender of parental rights.  Despite termination of her legal parental rights, Defendants DFCS and DCSS still enforce collection of $472 per month.  *Id.* at ¶28.

45.     Ms. Martinez's support amounts also did not change as her daughters aged out and left foster care or were adopted.  Despite three of her daughters being

adults and two being adopted, Defendants DFCS and DCSS still enforce collection of $472 per month. *Id.* at ¶34.

46.     Ms. Martinez has since had two additional children, currently ages 5 and 2. She has custody of both of her youngest children. *Id.* at ¶2.

47.     Defendant DCSS has sent letters to Ms. Martinez regarding her $13,157 child-support debt that threaten her with incarceration. Ex. 5, 2024-07-12 DCSS Delinquency Letter; Ex. 6, 2024-10-20 DCSS Collection Letter.

48.     Ms. Martinez fears that child-support debt could jeopardize her family and custodial children. Ex. 1, ¶32; Ex. 2; Ex. 5.

49.     Ms. Martinez sought assistance from a Georgia-based nonprofit, Together With Families. Ex. 1, ¶32.

50.     Ms. Martinez was able to pay off $13,157 in arrears with the assistance of a crowdfunding campaign and Together With Families. *Id.*

51.     Ms. Martinez was recently made aware of her right to request a modification of her child-support order. She submitted a request for modification in October 2024. Ex. 1, ¶35; Ex. 7, Request for Modification.

52.     Defendant DFCS informed Ms. Martinez that Defendant DFCS would give her an answer by early April 2025. Ex 1, ¶35.

53.     Ms. Martinez went to the DFCS office to inquire about the status of her request for modification in early April 2025. *Id.* at ¶36.

54.     At that time, Ms. Martinez was told that in order for the request for modification to be processed and considered, she would need to produce adoption certificates for her two daughters who had been adopted. *Id.* at ¶37.

55.     Ms. Martinez went to the court to attempt to get those certificates and was told by the clerk that she had no right to such documents because the adoptions were closed and she no longer had any parental right to her children. *Id.* at ¶38.

56.     Because Ms. Martinez and her partner cannot afford child-care for their two children, Ms. Martinez cares for their children full time, receiving no income. Her partner's income is their total household income, and a significant portion of that goes to making Ms. Martinez's support payments. *Id.* at ¶32.

57.     Ms. Martinez lives with the constant fear that, because she cannot afford to make her child-support payments, the children she lives with will be removed from her care. *Id.* at ¶39.

## B.     Defendants DFCS, DCSS, and DHS Trap Parents in a Cycle of Poverty

58.     Defendants first tear families apart, arguing parents are too poor to parent, then charge those same indigent parents for the foster care of their children. This irrational system renders parents incapable of curing the poverty status that Defendant DFCS claims is the basis for removal in the first place.

59.     Defendants DFCS and DCSS have the authority to enforce, or chose not to enforce, child-support orders against parents.

### i. Defendant DFCS Removes Children from Their Families Solely Because of Poverty

60.     Between fiscal years 2018 and 2022, children were removed from over 700 Georgia homes for "inadequate housing."  This accounted for nearly 20% of the total removals in the state during that time.   https://www.propublica.org/article/georgia-housing-assistance-foster-care

61.     This reason for removal rests almost entirely on poverty.  According to the Georgia Maltreatment Codes, published by DFCS, "inadequate housing" can be alleged for situations of disrepair, overcrowding, or, in the case of Ms. Martinez and her daughters, homelessness.  https://pamms.dhs.ga.gov/dfcs/cws/_attachments/appendix-c/maltreatment-codes.pdf, p. 6.

62.     Additionally, the Maltreatment Code criteria for inadequate food and clothing indicates that, where a parent fails to provide food or clothing due to an inability to afford such items, DFCS may refer to state-sponsored or private services to ameliorate food or clothing inadequacies.  *Id.*  This option does not insulate poor families from separation but does provide the potential for grace and charity where food and clothing are lacking.

63.     Unlike food or clothing, there is no exception, no assistance, and no alternative option for inadequate housing.  *Id.*

64.     Defendant DFCS's policies subject poor families in Georgia to separation and child-welfare involvement solely because they are poor.  The state

would more readily remove a child from their home and place them in foster care than provide adequate support to remedy the manifestations of poverty.

### ii.    DFCS and DCSS Offer No Indigency Relief from Payment Obligations

65.    In Georgia, Defendants DFCS and DCSS work together to assess, enforce, and collect child-support from parents of children in foster care.  Georgia Division of Family and Children Services Child-Welfare Policy Manual, Chapter 9.12 "Child Support," effective date August 2024.

66.    In August 2024, DFCS adopted new guidance on when to enforce or not enforce collection of child-support for children in foster care.  *Id.*

67.    Typically, DFCS is responsible for making child-support recommendations, or recommendations for enforcement of preexisting orders, for children in foster care.  DCSS then honors those recommendations through its enforcement efforts.  Since the August 2024 guidelines, DFCS will only make a referral to DCSS for child-support enforcement if a parent "abdicates their parental responsibility . . . and refuses to engage in case planning and reunification," a support order is already in place "when the child enters foster care," or "there is a new child support order from the juvenile court subsequent to the child entering foster care." *Id.*

68.    Under the August 2024 guidelines, DFCS will "periodically assess . . . whether establishing, enforcing, or continuing to enforce child support will prevent

or delay reunification." *Id.*

69.    This guidance does nothing to give relief from support orders established prior to August 2024. https://www.wabe.org/georgia-child-support-debt-foster-care/. Those under the pre-August 2024 policy still face unaffordable demands for payment that lack any consideration for ability to pay.

70.    With the August 2024 change, Defendants recognize that the enforcement of child-support prevents and delays reunification.

71.    Despite this recognition, Defendants still will not consider ability to pay for parents with older child-support orders with regard to the enforcement of child-support payments.

72.    Even considering the new DFCS guidance, the language does not explicitly require that ability to pay be taken into account when determining whether to enforce child-support payments, only that it must be "periodically assessed." Georgia Division of Family and Children Services Child-Welfare Policy Manual, Chapter 9.12 "Child Support," effective date August 2024.

73.    This policy does not require any action be taken if it is found that enforcing child-support will in fact delay or prevent reunification.

74.    Despite Ms. Martinez having zero income during most of the time her children were in foster care, Defendant DCSS continues to send Ms. Martinez enforcement letters, threaten her with incarceration, and impede her efforts to create

a suitable home for her children with exorbitant child-support charges and ever-increasing arrears.

### iii. Exorbitant Child-Support Payments Frustrate Non-Custodial Parents' Reunification Efforts

75.    In 2019, when her current child-support order was entered, Ms. Martinez was homeless, only sporadically employed, and had recently extricated her family from a domestic violence situation.  Ex. 1.

76.    While the instructions she received were unclear, Ms. Martinez knew that adequate housing was essential to regain custody of her children.

77.    Even when parents have the financial wherewithal to make timely child-support payments for children in foster care, the payments can themselves frustrate parents' efforts to pursue reunification.

78.    DFCS requires parents to have separate bedrooms for children of different genders and discourages parents from sharing rooms with even their same gender children.    https://www.propublica.org/article/in-georgia-inadequate-housing-can-mean-longer-stays-in-foster-care.

79.    Between fiscal years 2018 and 2022, cases that cited "inadequate housing" as a reason for removal took three months longer to achieve reunification than cases alleging abuse without housing instability.  *Id.*

80.    DFCS may also decline to approve multigenerational family or housing that does not have a formalized lease.  *Id.*

81.    As low-income parents struggle to make child-support payments, that money is directed away from their efforts to meet the stringent housing requirements of DFCS.

82.    Furthermore, if reunification is not achieved within 15 months, federal law directs states to pursue termination of parental rights and adoption.  42 U.S.C. § 670(1)(4).

83.    When parents are unable to devote their full resources to creating a lifestyle and environment that is appropriate for their children, the time between removal and reunification is extended, and the possibility of reunification may be removed entirely, as was the case for Ms. Martinez.

### iv.    August 2024 Policy Change

84.    In 2023, the federal government issued new guidance on when to assess and collect child-support from parents for children placed in foster care. https://cwpm.acf.gov/citations/title-iv-e/title-iv-e-general-title-iv-e-requirements/title-iv-e-general-title-iv-e-1, 8.4C. TITLE IV-E, General Title IV-E Requirements, Child support;    https://www.americanbar.org/groups/public_interest/child_law/project-areas/legal-representation/shifting-federal-guidance-on-mandatory-child-support-orders/.

85.     Federal policy states that "[i]t is almost never the case that securing an assignment of the rights to child support is in the best interest of the child."  The

guidance further explains that "[i]t's likely that reducing the income of the child's parent(s) could impede their ability to engage in reunification efforts, potentially extending the time the child spends in foster care." https://cwpm.acf.gov/citations/title-iv-e/title-iv-e-general-title-iv-e-requirements/title-iv-e-general-title-iv-e-1, 8.4C. TITLE IV-E, General Title IV-E Requirements, Child support.

86.    This federal guidance encourages agencies to abandon the practice of determining the appropriateness of child-support on a "case-by-case basis" and replace that with "across-the-board policies" that "reflect that an assignment of the rights to child support for children in title IV-E foster care is *not* required except in very rare instances." *Id.* (emphasis added).

87.    In August 2024, Defendant DFCS updated its child-support policies for children in foster care.  https://pamms.dhs.ga.gov/dfcs/cws/09-12.

88.    Defendant DFCS's updated guidance closely follows the recommendations of the federal government.

89.    Defendant DFCS's updated 2024 guidance includes under its "Practice Guidance" a section on "Reasons for Limiting Child Support Referrals." *Id.*

90.    This section echoes the federal guidance, stating that child-support referrals would only be appropriate in "cases where there will be no adverse impact on the successful achievement of the child's permanency plan of reunification." *Id.*

91.    Defendant DFCS's Practice Guidance further states that "[r]educing the

income of the parent(s) could impede their ability to engage in reunification efforts, potentially extending a child's time in foster care." This guidance mirrors the federal guidance nearly word-for-word. *Id.*

92.     The DFCS Practice Guidance also states that "Georgia law also allows DCSS to request a modification to the collection of child-support based on a child's permanency plan if the child-support may impede the parent's ability to establish a household and prepare for the child's return." *Id.*

93.     Despite DFCS's recognition of the harm child-support inflicts on poor families, this August 2024 guidance does nothing for parents who had child-support orders in place prior to August 2024, and Defendants continue to harm families through outdated enforcement practices.    https://www.wabe.org/georgia-child-support-debt-foster-care/.

94.     Because the current guidance does nothing to relieve ongoing orders already in place, DFCS and DCSS currently operate under two different policies: parents whose children were removed after August 2024 receive consideration on how child-support will impact their reunification plan, while families with earlier removals are given no consideration as DCSS pursues the collection of child-support from them.

## LEGAL VIOLATIONS

**A.    Defendants' Still-Enforced Prior Policy Violates Substantive Due Process Because It Infringes on Indigent Parents' Fundamental**

Rights Without Being Narrowly Tailored to a Compelling Government Interest and Is Not the Least Restrictive Means of Furthering that Interest

95.     In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the Supreme Court held that "the child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.* at 535.

96.     In *Stanley v. Illinois*, 405 U.S. 645 (1972), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Supreme Court affirmed the fundamental right of parents "in the companionship, care, custody, and management" of their children. *Stanley*, 405 U.S. at 651.

97.     Defendants' policy to charge indigent non-custodial parents child-support for their children in foster care delays and prevents family-reunification, thereby burdening this fundamental right and subjecting the policy to strict scrutiny. *Stanley*, 405 U.S. at 651–52.

98.     When non-custodial parents are forced to pay child-support beyond their means, it frustrates their ability to achieve other financial benchmarks required for reunification by DFCS and the court.

99.     A parent with limited income cannot simultaneously pay hundreds of dollars in child-support and save money for adequate housing, food, clothing, and medical care for their children.

100.   Mounting child-support debt is held against parents by DFCS when considering family-reunification.  *See* Georgia Division of Family and Children Services Child-Welfare Policy Manual, Chapter 9.12 "Child Support," effective date December 2018 ("Documentation of the payment history of parents may be useful information in preparing for a review, building a case for TRP or documenting evidence in a court hearing.").

101.   Following the August 2024 policy changes, DFCS recommends that periodic assessments occur regarding "whether establishing, enforcing, or continuing to enforce child-support will prevent or delay reunification."  *See* Georgia Division of Family and Children Services Child-Welfare Policy Manual, Chapter 9.12 "Child Support" effective date August 2024.

102.   Such language is not included in the pre-2024 guidance, and the reassessments and grace outlined in the August 2024 guidance are not extended to parents with child-support orders issued prior to the August 2024 Policy.

103.   Defendants' prevention or delay of reunification because of non-custodial parents' inability to pay child-support for their children in foster care violates such parents' fundamental rights.

104.   While the August 2024 policy exists and applies to new cases, the previous Policy is still in effect and is controlling for parents whose support orders were issued prior to August 2024.   https://www.propublica.org/article/georgia-

housing-assistance-foster-care.

105.   For parents whose child-support obligations are still based on the pre-2024 policy, the stringent child-support requirements frustrate, delay, and, in some cases, entirely prevent reunification with their children, thereby infringing on their fundamental right to parent.

106.   Because Defendant DFCS's policy infringes on a fundamental right, it is subject to strict scrutiny, must be narrowly tailored to further a compelling government interest, and must do so in the least restrictive means possible. *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973).

107.   Reimbursement for foster care is never listed as a goal of the department or division, and the current policy of enforcement for pre-2024 exists in direct conflict with the state interests expressed by DHS and DFCS's public statements.    https://dfcs.georgia.gov/about-us/blueprint-family-first/vision-child-welfare-georgia#:~:text=Georgia's%20Blueprint%20for%20Family%20First%20is%20our%20state's%20plan%20for,families%20for%20a%20stronger%20Georgia.

108.   Defendants may have some interest in being reimbursed for the funds they provide to foster families, but the state's published "Blueprint for Family First" indicates that reimbursement is not, in fact, the compelling state interest at play.

109.   The "Vision for Child Welfare in Georgia" section of the "Blueprint for Family First" states that the goal is "family preservation" and that DFCS will "use

the Family First Act to support [its] goal of keeping children with their families by offering evidence-based services that help address some of the root causes responsible for many children entering foster care." https://dfcs.georgia.gov/about-us/blueprint-family-first/vision-child-welfare-georgia#:~:text=Georgia's%20 Blueprint%20for%20Family%20First%20is%20our%20state's%20plan%20for,fam ilies%20for%20a%20stronger%20Georgia.

110.   Furthermore, Defendant DFCS recognizes that "[r]esearch has shown that the trauma that accompanies family separation often results in a lifetime of emotional and psychological problems.  When we can provide support that allows children and youth to grow up safely in their own homes, we build a path towards stronger families and brighter futures for our young people." *Id.*

111.   DFCS recognizes the trauma and harm that can come from family separation and the need for family-reunification.

112.   In the case of Ms. Martinez, her child-support debt became so large and overwhelming that she, at the urging of Defendant DFCS, surrendered her rights to her children, shattering any hope of eventual reunification and causing irreparable trauma for her children and herself.

113.  Furthermore, Defendant DFCS recognizes that child-support enforcement has the power to delay and prevent reunification and actively made changes to the enforcement policy to allow for prevention of such delays in the

23

future, yet it failed to apply this policy to all parents despite the recognized harms.

114.   Defendant DFCS's pre-2024 policy prevents reunification and operates contrary to the stated goals of Defendant DFCS.

115.   When the stated goals of Defendant DFCS are family continuity and reunification, it cannot be said that Defendants DFCS, DCSS, or DHS have a compelling interest in enforcing a policy that is in direct opposition with those goals.

116.   Strict scrutiny also requires that, even if the collection of child-support is a compelling state interest, the policy must be narrowly tailored to achieve that interest.

117.   Defendant DFCS's policy is not narrowly tailored to achieve any such interest.

118.   The pre-2024 Policy for foster care child-support makes no distinction between parents who can and cannot afford child-support nor how child-support enforcement should be handled if it will ultimately delay reunification.

119.   Even if the state's interest is being reimbursed, punishing parents who cannot afford their child-support does nothing to effectuate said reimbursement.

120.   Furthermore, by frustrating parents' reunification efforts, the state must direct additional funds towards the care of foster children as they spend more time in the foster system.

121.   Defendants' means of achieving reimbursement frustrate Defendants'

own goals.

122.    Defendant DFCS's pre-2024 policy also prevents indigent parents from diverting what slim resources they have to achieving the benchmarks they must meet in order to regain custody.  This policy forces children to remain in foster care longer than they otherwise would, thereby increasing the burden on the state to reimburse foster families for the care of those children.

123.    Furthermore, Defendants' policy is overly restrictive in its failure to consider the ability of non-custodial parents to pay, in addition to the lack of leniency in Defendants' recommendations and enforcement.

124.    Because Defendants' policy is not narrowly tailored to achieve a compelling state interest by the least restrictive means, and it infringes on the fundamental rights of parents, Defendants violate substantive due process, and the policy is unconstitutional.

### B.    Defendants Still-Enforced Prior Policy Violates Equal Protection Because It Disparately Impacts the Fundamental Rights of Indigent Parents

125.    As written, Defendant DFCS's pre-2024 policy applies universally — to all parents of children in foster care — but functionally it operates only to restrict the rights of indigent parents to regain custody of their children.

126.    A state action that infringes on a fundamental right is subject to strict scrutiny, regardless of whether it affects a suspect or quasi-suspect class.  *E.g.*, *Carey*

*v. Population Serv. Int'l*, 431 U.S. 678, 686 (1977) ("[W]here a decision as fundamental as whether to bear or beget a child is involved, regulations imposing a burden on it may be justified only by compelling state interests, and must be narrowly drawn to express only those interests.").

127.    Depriving individuals of equal rights solely because of their inability to pay is wealth-based discrimination. *See*, *e.g.*, *Bearden v. Georgia*, 461 U.S. 660, 667 (1983) (holding that probation cannot be revoked because a probationer is unable to pay restitution); *see also Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (prohibiting denial of access to appeal solely because of inability to pay court costs).

128.    Under the pre-2024 policy, Defendants DFCS and DCSS enforce child-support payments, delay reunification, and threaten non-custodial parents with incarceration without any determination of whether the nonpayment was willful or the individuals were simply too poor to pay.

129.    Defendants DFCS and DCSS promulgated and enforced a punitive scheme that inevitably results in parents being deprived of their fundamental rights due to their inability to pay.

130.    By depriving parents of a fundamental right solely for their inability to pay, Defendants DFSC and DCSS engage in wealth-based discrimination in violation of equal protection.

131.    Defendants fail to narrowly tailor their policy to achieve a compelling

state interest by the least restrictive means because Defendants prevent indigent parents from regaining custody of their children while also expending government resources on collection efforts and continued foster care of the children of such parents.

132.    Defendants DHS and DFCS state several compelling interests in their mission and on their websites.  The stated interests include the preservation of families, family-reunification, and addressing the "root causes" that contribute to children being placed in foster care.

133.    Enforcement for the purpose of reimbursement directly conflicts with the published interests and goals expressed by DHS and DFCS's public statements. https://dfcs.georgia.gov/about-us/blueprint-family-first/vision-child-welfare-georgia#:~:text=Georgia's%20Blueprint%20for%20Family%20First%20is%20our%20state's%20plan%20for,families%20for%20a%20stronger%20Georgia.

134.    In its "Practice Guidance," Defendant DFCS recognizes the harms child-support collections can cause in preventing parents from achieving reunification goals and prolonging family separation. https://pamms.dhs.ga.gov/dfcs/cws/09-12/#reasons-for-limiting-child-support-referrals.

135.    Defendant DFCS and DHS's own statements and policy changes made in August 2024 exhibit an understanding that the former (but still-enforced) policy is not narrowly tailored to the interests they have espoused.

136.    Furthermore, were the policy narrowly tailored, it would not be causing outsized harm for indigent parents and poor families.

137.    Even if the recoupment of money paid for the care of foster children is a compelling interest, the fact that it sweeps up parents who cannot afford to pay and places them in the same category as parents who willfully refuse to pay indicates that Defendants have not narrowly tailored the policy to achieve those means.

138.    Punishing poor parents by delaying reunification or creating additional hurdles to regaining custody of their children is not the least restrictive means of ensuring that the state has money for foster care.

139.    If poor parents do not have money to pay child-support, continuing to bill them, threatening them with incarceration, and keeping their children from them will not suddenly make them able to pay.

140.    Defendants' previous policy, which is still enforced against parents with pre-2024 child-support orders, unconstitutionally deprives poor parents of the fundamental right to parent and is a violation of the Equal Protection Clause.

**C.    Defendants Violate Equal Protection by Failing to Apply the August 2024 Policy to Similarly Situated Parents with Support Orders Issued Before 2024**

141.    As stated in *City of Cleburne, Tex. v. Cleburne Living Ctr.*, "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

28

essentially a direction that all persons similarly situated should be treated alike." 473 U.S. 432, 439 (1985).

142.    In August 2024, Defendants DFCS and DCSS published new policy guidelines on when to enforce child-support for children in foster care; these new guidelines limit enforcement when doing so would "prevent or delay reunification." https://pamms.dhs.ga.gov/dfcs/cws/09-12/.

143.    Since enacting this policy, Defendants DFCS and DCCS have only applied the limitations on enforcement to new child-support orders and have declined to apply the policy in cases where child-support orders were issued prior to August 2024. https://www.wabe.org/georgia-child-support-debt-foster-care/.

144.    Defendants DFCS and DCSS violate equal protection by declining to enforce the policy to all parents, creating two groups of similarly situated individuals who are separated only by the arbitrary distinction of the date their child-support order was entered.

145.    As these are similarly situated individuals, and Defendants divide them only by the inception date of their child-support order, the constitutionality of the application of the August 2024 policy must be assessed on rational basis review and "need only be rationally related to legitimate government interests." *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 587 U.S. 490, 491 (2019).

146.    While the threshold for rational basis review is low, Defendants'

decision to not apply the August 2024 policy to all does not survive it.

147.    Under *City of Cleburne*, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  473 U.S. at 446 (internal citation omitted).

148.    Here, Defendants' distinction is completely arbitrary and irrational when considering the aims of the August 2024 policy.

149.    Defendants created the August 2024 policy in the wake of the federal guidance which it mirrors, recognizing that family separation is harmful and that continued enforcement of child-support orders may delay or prevent reunification.

150.    The trauma and hardship of family separation on both children and parents is no different simply because their particular support order predates the August 2024 policy.

151.    Furthermore, indigent parents are no better equipped to pay their child-support and succeed in reunifying with their children simply because their particular support order predates the August 2024 policy.

152.    Even if Defendants DFCS and DCSS did indicate that their goal was reimbursement and not limiting trauma, Defendants cannot expect to get blood from a stone, and parents are not any more likely to suddenly be able to afford support orders that they have been struggling to pay simply because their particular support order predates the August 2024 policy.

153.   Defendants' failure to apply the August 2024 policy to all parents creates two distinct groups of similarly situated individuals, separated only by the happenstance of time; Defendants have no rational basis on which to rest this decision and, as such, it is an unconstitutional violation of equal protection.

### D.    Defendants Violate Procedural Due Process by Failing to Consider Ability to Pay When Assigning and Enforcing Child-Support for Children in Foster Care

154.   Individuals have a property interest in their own money that cannot be taken away without due process of law. *Nelson v. Colorado*, 581 U.S. 128, 135 (2017); *see also Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 32 (D.D.C. 2001) (finding that financial injury resulting in "[t]he inability to pay utility bills or to feed one's children or the risk of being evicted from one's home, amounts to irreparable injury"); *Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1030 (11th Cir. 2022) ("[E]ven a temporary or partial deprivation of property without proper notice or a hearing violates due process."). Due Process requires Defendants to conduct a pre-deprivation ability-to-pay hearing and to provide notice that such hearings are available.

155.   The pre-deprivation hearing must contemplate ability to pay. Because Defendants delay and limit family-reunification due to failure to pay child-support, a meaningful hearing in this context is one that determines whether the nonpayment was willful, as willfulness speaks directly to ability to pay.

31

156.   An ability-to-pay hearing must be available before DCSS engages in enforcement actions.

157.   Under the current policy, DFCS and DCSS considerations are not public, there is no notice that DFCS and DCSS are considering whether to enforce child-support orders, and impacted parents have no opportunity to be heard.

158.   Presently, parents may have an opportunity to be heard at the time child-support is ordered, but, as in Ms. Martinez's case, this is inadequate and does not contribute to the DFCS and DCSS decision as to enforcement of such orders. Ex. 1, Martinez Decl.

159.   Due process also requires that all parents facing delayed reunification for unpaid child-support receive adequate notice that a hearing is available and that they have the opportunity to raise inability to pay as a defense at that hearing.

160.   Prior to delaying reunification, DFCS and DCSS provide no notice informing parents of any right to raise ability-to-pay as a defense.

161.   The current method of applying for reconsideration does nothing to impact existing payments and debt, is not sufficiently publicized, and is not an adequate means of assessing ability-to-pay in the event of non-willful nonpayment.

162.   Furthermore, DFCS and DCSS do not independently review parents' ability to pay prior to enforcement if those parents' support orders were entered prior to the August 2024 policy taking effect.   Thus, Defendants delay and prevent

reunification without considering ability to pay.

163.   In addition to failing to consider ability to pay when enforcing child-support, DCSS threatens incarceration for unpaid child-support, regardless of ability to pay. This results in incarceration for non-willful nonpayment, depriving parents of their fundamental liberty rights for reasons of poverty. *See* Ex. 1 & 2.

164.   The Fourteenth Amendment prohibits incarceration for non-willful failure to make monetary payments. *See Bearden v. Georgia*, 461 U.S. 660, 667 (1983); *Tate v. Short*, 401 U.S. 395, 398 (1971); *Williams v. Illinois*, 399 U.S. 235, 244 (1970); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956). The right to freedom from detention is fundamental, and the United States Supreme Court has never wavered from the principle that "[f]reedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

165.   Given this fundamental right to liberty, any attempt to deprive someone of their liberty — including through incarceration for failure to make a monetary payment — is subject to heightened scrutiny. *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) (the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests" such as freedom from government detention).

166.   Defendant DCSS's threats of incarceration do not meet this heightened

standard. Liberty cannot hinge on ability to pay, and Defendant's attempts to imprison non-custodial parents for failure to pay child-support is not narrowly tailored to serve a compelling government interest.

167. Defendant DCSS uses the threat of jail time to coerce non-custodial parents into paying child-support. Ex. 5.

168. Defendant DCSS offers no opportunity for these parents to raise indigency as a defense to the accusations of non-payment and threat of incarceration.

169. As such, Defendant DCSS threatens incarceration for failure to pay child-support, regardless of ability to pay.

170. Because Defendants DFCS and DCSS do not provide a pre-deprivation ability-to-pay hearing for parents facing child-support enforcement, there is a high risk that parents will be deprived of their fundamental right to raise their own children for reasons of poverty.

171. Furthermore, Defendant DCSS's failure to consider ability to pay when threatening incarceration for nonpayment violates due process.

**E.    Defendants Violate Due Process by Failing to Adjust Plaintiff's Child-Support After Her Children Reached the Age of Majority or Were Adopted**

172. Plaintiff surrendered her parental rights to six of her children. Of those six children, three have reached the age of majority (18), two have been adopted, and one has a pending adoption.

173.    Despite five of these six children no longer being in foster care or receiving funding from the state as foster children, DFCS and DCSS continue to charge Plaintiff the same amount of child-support she was originally assigned.

174.    Defendants are aware that these five children are no longer in the care of the foster system but have made no changes to Plaintiff's child-support obligation.

175.    Defendants allow no adequate procedure for correcting this erroneous deprivation. Defendants' procedures for reconsideration are not well publicized, slow, and legally impossible at times.

176.    Defendant DCSS allegedly employs a process for re-review of support amounts.  Plaintiff was unaware of this process until five years into her child-support obligation and has been unable to effectively engage with the process due to legally impossible requirements set by Defendants.

177.    Defendants require that Ms. Martinez obtain documentation she has no legal right or access to in order to even begin a review of her request.  Her request was pending for over a year before Ms. Martinez was made aware of the requirement to obtain these sealed documents.  *See* Ex. 1, Decl. Martinez., ¶¶35–38.

178.    Defendant DCSS holds the authority to review and modify child-support amounts based on the requests for review.

179.    Plaintiff has a property interest in her money and is entitled to due process with regard to Defendant's enforcement of child-support and deprivation of

that money.

180.   Plaintiff is entitled to a procedure that is tailored to safeguard her interests from erroneous deprivation. *Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976).

181.   Under *Mathews v. Eldridge*, the sufficiency of procedures may be assessed by considering: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Id.* at 321.

182.   Here, the focus is on the erroneousness of the deprivation and value of additional procedural safeguards.

183.   Defendants DFCS and DCSS credit child-support payments made by biological parents directly to the support of their children in foster care.

184.   If children are no longer in foster care, by reason of age or adoption, then Defendants are no longer responsible for their care, and Defendants' deprivation of parents' property has no connection to such care.

185.   Absent a connection to the care of foster children, Defendants' deprivation of parents' property is entirely erroneous.

186.   Given that Plaintiff has been erroneously deprived of her property, it is

clear that the current process afforded to parents is insufficient, and there is significant value in additional procedural safeguards including, but not limited to, periodic reassessment of child-support orders and reassessment at the moment of qualifying events such as adoptions or eighteenth birthdays.

187.    Defendants violate due process by failing to guard against the risk — and reality — of erroneous deprivation and must implement additional procedural safeguards to meet the burden the Constitution requires of them.

### F.    Defendants Violated State Law by Illegally Charging Plaintiff Child-Support After Her Children Reached the Age of Majority or Were Adopted

188.    Plaintiff has six children of whom she does not have custody and has surrendered her parental rights.

189.    Of those six children, three have reached the age of majority and left the foster care system, two have been adopted, and one has a pending adoption.

190.    Ms. Martinez's three eldest children turned 18 in January 2025, January 2022, and August 2021, respectively.

191.    Plaintiff surrendered her rights to these children in December 2019.

192.    Pursuant to Georgia Code Section 19-6-15(e), covering the "[d]uration of child support responsibility," the obligation "to provide support for a minor child shall continue until the child reaches the age of majority, dies, marries, or becomes emancipated, whichever first occurs."

193.    The only exception to child-support ending at the age of majority is for a child over the age of 18 who is still enrolled in secondary school and who attains the age of majority before completing secondary school, "provided that such financial assistance shall not be required after a child attains 20 years of age."  GA Code § 19-5-15(e) (2024).  To the best of Ms. Martinez's knowledge, this exception does not apply to any of her children.

194.    Additionally, the Chapter 9.9, Section 1(a) of Defendant DFCS's Policy Manual states that a child is only eligible for Title IV-E foster care reimbursement amounts when the child is under 18 years of age.  https://pamms.dhs.ga.gov/dfcs/cws/09-09/.

195.    Chapter 9.9 of the Policy Manual also lists "Fatal Flaws with IV-E," explaining "circumstances [that] are fatal to IV-E eligibility; i.e., the child loses IV-E eligibility and reimbursability for the entire placement . . . in foster care."  One such circumstance is when the child reaches age 18.  Another is when DFCS custody is terminated through adoption.  *Id.*

196.    Ms. Martinez's three eldest children are all over the age of 18 and are no longer eligible for Title IV-E payments from the state.  There is no public benefit for which the state could be collecting child-support from Ms. Martinez as reimbursement.

197.    Defendants DFCS and DCSS continue to charge Ms. Martinez the same

amount of child-support ($472 per month) despite half of her non-custodial children turning 18, contrary to Georgia law and DFCS policy.

198.   With regard to Ms. Martinez's adopted children, DFCS Policy Manual Chapter 9.9, Section 1(c) states that a child is not eligible for foster care maintenance payments unless they live in a reimbursable placement.  Reimbursable placements are foster homes, childcare facilities, or residential treatment facilities.  *Id.*

199.   Adoptive homes are not foster homes and thus are not reimbursable placements.

200.   Additionally, Chapter 9.9 lists termination of DFCS custody as a "fatal circumstance" for support payments.  *Id.*

201.   Adoption terminates state custody; an adopted child is no longer eligible for child-support payments.

202.   With regard to her adopted children, there is no public disbursement for which Ms. Martinez should be required to reimburse the state.

203.   Furthermore, GA Code § 15-11-261(a) states that "[a]n order terminating the rights of a parent . . . shall divest the parent and his or her child of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other except: (1) the right of such child to receive child-support from his or her parent until a final order of adoption is entered."

204.   A final order of adoption has been entered for two of Ms. Martinez's

children.  As such, she is no longer obligated to pay child-support for those children.

205.  Ms. Martinez should have been relieved of the child-support requirement for two of her remaining three underaged, non-custodial children when the adoptions became final.

206.  Ms. Martinez's child-support amount has not changed to reflect these adoptions.

207.  Only one of Ms. Martinez's six non-custodial children remains in foster care and eligible for child-support, but her payment amount has never been adjusted.

208.  Ms. Martinez is still being charged unjustifiable and erroneous amounts of child-support in violation of Georgia statute and DFCS Policy.

## CLASS ACTION ALLEGATIONS

209.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Annalinda Martinez brings this action on behalf of herself and all others similarly situated, as representative of the following classes:

210.  <u>Indigent Class</u>: All indigent persons who are or have been charged child-support for children in foster care, pursuant to the pre-August 2024 policy promulgated and enforced by the Georgia Department of Human Services, Georgia Division of Family and Children Services, and Division of Child Support Services.

211.  <u>Adult-and-Adopted-Children Class</u>: All persons who are or have been charged child-support for children in foster care whose children have reached the

age of majority and concluded secondary school or have been adopted, and who were charged child-support after the time at which those children reached the age of majority and concluded secondary school or were adopted.

212.    As described below, each class satisfies the prerequisites of numerosity, commonality, typicality, and adequacy of representation required by Rule 23(a)(1), (2), (3), and (4) of the Federal Rules of Civil Procedure to proceed as a class action.

213.    Because of the risk of inconsistent adjudications or prejudice to absent class members, as well as the request for injunctive relief and damages, the proposed classes also meet the requirements of Rule 23(b)(1), (2), and (3).

## A.    Numerosity: Fed. R. Civ. P. 23(a)(1)

214.    The persons in the proposed classes are so numerous that joinder of all members is impracticable.  Each class is composed of hundreds to thousands of members.

215.    For example, between 2018 and 2022 over 700 children were removed from homes where parents were likely indigent and incapable of making child-support payments.  Considering those years, in addition to prior years and the years since 2022, the number of individuals in the indigent class likely numbers in the thousands.

216.    Given the difficulties Plaintiff has had with her request for reconsideration, and the present impossibility of her success, it is likely that the

adult-and-adopted-children class is in the hundreds, if not thousands.

217.   Ascertainability of the exact number of class members is readily achievable through analysis of Defendants' records.

**B.    Commonality: Fed R. Civ. P. 23(a)(2)**

218.   Relief sought by the indigent class is common to all class members: ceasing enforcement of child-support for children in foster care where parents are unable to make such payments due to indigency and such enforcement would prevent or delay family-reunification, so as to protect the constitutional rights of Plaintiffs and class members now and in the future.

219.   Relief sought by the adult-and-adopted-children class is common to all class members: ceasing the practice of charging parents the same amount in child-support when one or more of their non-custodial children has reached the age of majority and is no longer enrolled in secondary school or has been adopted, and to reimburse parents of such children unjustly charged under that practice.

220.   There are also issues of law and fact common to the classes.  Among the common issues of fact for the indigent class are:

> a.    Do Defendants have control over the child-support fees so as to make the decision to not enforce those fees?
>
> b.    Do Defendants have control over relevant policies so as to alter those policies to provide relief for indigent parents?

c.     Do Defendants enforce the pre-August 2024 policy against class members?

d.     Do Defendants frustrate, delay, or prevent family-reunification through enforcement of the pre-August 2024 policy?

e.     Do Defendants' policies impact indigent parents and families differently from parents with adequate means to pay?

f.     Do Defendants threaten non-custodial parents with incarceration for failure to pay child-support regardless of ability to pay?

g.     Do Defendants incarcerate parents for failure to pay child-support regardless of ability to pay?

h.     Does Defendants' enforcement of the policy impact reunification for indigent parents when non-indigent parents do not experience the same delays?

221.   Among the common issues of fact for the adult-and-adopted-children class are:

a.     Do Defendants continue to charge parents for child-support when they no longer have qualifying children benefitting from the foster care system?

b.     Do Defendants fail to modify child-support when children no longer qualify for state disbursements?

    c.    Do Defendants frustrate or prevent parents from requesting modifications when their children reach the age of majority or are adopted?

222.   Among the common issues of law for the indigent class are:

    a.    Do Defendants violate due process by enforcing the pre-August 2024 policy against indigent parents?

    b.    Do Defendants violate equal protection by enforcing the pre-August 2024 policy against indigent parents?

    c.    Do Defendants violate equal protection by enforcing the pre-August 2024 policy against parents with child-support orders earlier than August 2024 while exempting parents with child-support orders established after August 2024?

223.   Among the common issues of law for the adult-and-adopted-children class are:

    d.    Do Defendants violate federal due process by charging child-support for children who have aged out of foster care or been adopted?

    e.    Do Defendants violate state statutes by charging child-support for children who have aged out of foster care or been adopted?

**C.    Typicality: Fed. R. Civ. P. 23(a)(3)**

224. Plaintiff Annalinda Martinez has an active child-support order for six children who were or are currently in foster care. Defendants continue to enforce Plaintiff's child-support order. Plaintiff has no income of her own. Plaintiff has suffered harms in the same way as the other members of the classes. Plaintiff's claims are typical of the proposed classes.

225. All class members are subject to child-support obligations for children in foster care.

226. All class members are required to make child-support payments for children in foster care.

227. All indigent class members are indigent.

228. All members of the adult-and-adopted-children class have children who have aged out or been adopted out of foster care and have child-support obligations that have not been altered to reflect that change.

229. Defendants enforce child-support obligations against all class members without consideration of ability to pay.

230. Defendants enforce child-support obligations against all class members without consideration of the impact of such enforcement on family-reunification.

231. Defendants enforce child-support obligations against all class members, regardless of the age and adoption status of their non-custodial children.

**D.      Adequacy: Fed. R. Civ. P. 23(a)(4) and 23(g)**

232.    Plaintiff will fairly and adequately represent the interests of the classes. Plaintiff has no claim agnostic to those of the classes.  In support of this proposition, Plaintiff would show that:

233.    Plaintiff is a member of the proposed classes;

234.    Plaintiff has an interest in representing the proposed classes;

235.    Plaintiff has no interest adverse to the rest of the classes; and

236.    Plaintiff has suffered the same harm as the proposed classes.

237.    Class counsel will fairly and adequately represent the interests of the class.  Plaintiffs are represented by attorneys from Equal Justice Under Law and Darice Good of Good Legal Firm, LLC.  Equal Justice Under Law attorneys have experience in litigating complex civil rights matters in federal court, particularly with regard to wealth-based discrimination.  Good Legal Firm, LLC attorneys possess similar experience, with the addition of significant practice in Georgia courts.  Class counsel has extensive knowledge of the relevant constitutional and statutory law.  Class counsel also has a detailed understanding of state law and county practices as they related to federal constitutional requirements.

238.    Counsel has devoted significant time and resources to becoming intimately familiar with how the Georgia Department of Human Services, Division of Family and Children Services, and Division of Child Support Services operate, specifically as to charging child-support and the consequences of non-payment of

such child-support. Counsel have also developed relationships with some of those victimized by Defendants' practices. The interests of class members will be fairly and adequately protected by the Plaintiff and her attorneys.

### E. Predominance and Risk of Inconsistent Adjudications: Fed. R. Civ. P. 23(b)(1)

239. The common questions of fact and legal issues applicable to each individual member of the proposed classes are identical. The prosecution of separate suits by individual members of the proposed class would create risk of inconsistent adjudications of the legal issues and would establish incompatible standards of conduct for any party opposing the class. Common questions of law or fact predominate over any question affecting only individual class members. Nothing short of a universally-applied remedy to all members of the classes would address the allegations set forth in this complaint.

### F. Injunctive and Declaratory Relief: Fed. R. Civ. P. 23(b)(2)

240. The indigent class seeks injunctive and declaratory relief under Rule 23(b)(2) to enjoin Defendants from acting under the prior policy, specifically as to enforcing child-support orders where they would not be enforced under the August 2024 policy. Such injunctive and declaratory relief is appropriate because Defendants have acted in the same unconstitutional manner with respect to all class members and an injunction and declaration prohibiting Defendants from enforcing child-support under the prior policy would provide relief to every class and subclass

member.

241.    The adult-and-adopted-children class seeks injunctive and declaratory relief under Rule 23(b)(2) to enjoin Defendants from enforcing child-support obligations for adult or adopted children who no longer qualify for state disbursements, and to affirmatively require Defendants to modify child-support obligations to reflect these changes as Defendants become aware of them.

242.    The classes also seek damages from Defendants for child-support that they have been charged unconstitutionally and contrary to the authorizing statutes, and for which they have paid.

243.    A class action is superior to any other available method for the fair and efficient adjudication of this controversy.  All class members are subject to child-support obligations and DFCS and DCSS policies.  Individual adjudications would be inefficient and risk inconsistent rulings, despite every adjudication turning on the same policies — specifically, Defendants' practice of implementing the pre-August 2024 policy for parents with child-support orders predating that policy.

### G.    Damages: Fed. R. Civ. P. 23(b)(3)

244.    This case is significantly more manageable as a class action than as individual adjudications because of the common issues of fact and law, which predominate over minor individual differences between class members.

245.    A class action is superior to all other methods of adjudication as

damages in this case will be calculated in the same manner for all class members.

246.   Class members have limited interest in individually controlling the prosecution or defense of separate actions.

247.   Pursuant to Counsel and Plaintiff's current knowledge, there is no litigation on this matter that has already been initiated by or against any class members.

248.   Due to Defendants' status as statewide operators, it is desirable and economical to concentrate the litigation of these claims to a particular forum.

249.   Thus, certification under Rule 23(b)(3) is appropriate.

## CLAIMS FOR RELIEF

### Count One:
### Due Process Violation of the Fundamental Right to Parent

250.   Plaintiff incorporates by reference each and all of the previous allegations in this Complaint.

251.   Defendants' unconstitutional actions are subject to strict scrutiny because they impact and restrict Plaintiff's fundamental right to parent.

252.   Therefore, Defendants' policy must be narrowly tailored to achieve a compelling state interest and must do so by the least restrictive means.

253.   Defendants' child-support policy is not narrowly tailored to achieve the stated goals of reunification and family support because it makes struggling parents less likely to achieve the benchmarks required of them to regain custody of their

children.

254.   Defendants' child-support policy is not narrowly tailored to the best interest of children because it increases the known trauma of family separation by delaying reunification and threats of delayed reunification and incarceration are no more likely to enable poor parents to make their child-support payments.

255.   Because Defendants' policy is not narrowly tailored to any compelling state interest, it violates substantive due process.

## Count Two:
## Equal Protection Violation for Wealth-Based Discrimination

256.   Plaintiff incorporates by reference each and all of the previous allegations in this complaint.

257.   Defendants violate equal protection by discriminating against individuals on the basis of wealth-status in such a way that impacts their fundamental right to parent.

258.   Because Defendants' discrimination impacts a fundamental right, their actions are subject to strict scrutiny, and must be narrowly tailored to achieve a compelling state interest by the least restrictive means.

259.   Defendants' policy disparately impacts poor parents' ability to achieve reunification with their children in foster care through enforcement of child-support orders.

260.   Defendants' child-support policy is not narrowly tailored to achieve the

stated goals of reunification and family support because it makes struggling parents less likely to achieve the benchmarks required of them to regain custody of their children.

261.   Defendants' policy does nothing to increase the likelihood that poor parents will be able to make child-support payments and achieve reunification.

262.   Defendants' policy disparately impacts the fundamental rights of poor parents who cannot afford child-support by hampering their ability to achieve required benchmarks to regain custody of their children and by delaying reunification for unpaid child-support.

263.   Defendants' policy does not have the same impact on the fundamental rights of wealthier parents, who are able to pay child-support, achieve the required benchmarks without financial hardship, and whose reunification is not delayed by their inability to make payments.

264.   Because Defendants' policy is not narrowly tailored to any compelling state interest and discriminates on the basis of wealth, it violates equal protection.

<strong>Count Three:<br>Equal Protection Violation for Distinguishing between Parents<br>Before and After August 2024 Policy</strong>

265.   Defendants violate equal protection by applying the August 2024 policy differently to two arbitrarily defined groups of similarly situated individuals.

266.   Defendants have no rational basis for refusing to apply the August 2024

policy to all individuals with child-support orders for children in foster care.

267.   Defendants' purpose in creating the August 2024 policy was to alleviate the burden of child-support enforcement on indigent parents and facilitate reunification in recognition of the hardships child-support orders created for poor parents seeking to achieve reunification.

268.   The fact that some indigent parents have child-support orders put in place before August 2024 makes them no more capable of paying child-support, and no less vulnerable to the harms of child-support enforcement and family separation.

269.   Defendants' failure to apply the August 2024 policy to all parents is arbitrary, has no rational basis, and is a violation of equal protection.

## Count Four:
## Violation of Due Process for Failure to Assess Ability to Pay
## Prior to Enforcement of Child-Support

270.   Plaintiff incorporates by reference each and all of the previous allegations in this complaint.

271.   Defendants' policy that enforces child-support payments violates procedural due process because it does not guarantee an ability-to-pay assessment or provide that notice of such an assessment be provided.

272.   Defendants also threaten incarceration for failure to pay child-support with no ability-to-pay assessment or opportunity to raise ability to pay as a defense.

273.   Plaintiff and others similarly situated have protected property interests

in their own money.

274.    Parents are constitutionally entitled to an ability-to-pay assessment and notice of that assessment prior to Defendants enforcing child-support and delaying or preventing family-reunification.

275.    Defendants DFCS and DCSS's policy authorizes the deprivation of property and liberty interests without adequate due process because it does not guarantee an ability-to-pay assessment for all parents facing child-support enforcement, delayed reunification, and threatened incarceration, and it does not mandate that all such parents be notified of their right to assert ability to pay as a defense.

**Count Five:**
**Violation of Procedural Due Process for Charging Erroneous Child-Support**

276.    Plaintiff incorporates by reference each and all of the previous allegations in this complaint.

277.    Defendants have continued to charge Plaintiff child-support for children who are no longer in the custody of the foster care system and are no longer receiving the benefits of such child-support payments.

278.    Under *Mathews v. Eldridge*, this deprivation of Plaintiff's property violates due process.

279.    Plaintiff's interest in retaining her funds is high, as she has two custodial children at home. The risk of erroneous deprivation is unacceptable and

ongoing. The state has no countervailing interest in Plaintiff's money because the benefits for which it would be used are no longer being paid out.

280.   Defendants fail on each and every part of the analysis under *Mathews* and as such violate due process by failing to adjust Plaintiff's child-support order following the qualifying events of her children reaching the age of majority and being adopted.

### Count Six:
### Violation of GA Code § 19-6-15(e) and GA Code § 15-11-261(a)

281.   Plaintiff incorporates by reference each and all of the previous allegations in this complaint.

282.   Pursuant to GA Code § 19-6-15(e) and GA Code § 15-11-261(a), parents are not to be charged child-support payments for children who are no longer receiving the benefit of such payments in foster care by nature of reaching the age of majority or being adopted.

283.   Defendants continued to charge Plaintiff the same, unadjusted amount of foster care despite five of her six children no longer being eligible due to their age or adoption.

284.   Plaintiff has made active attempts to have her child-support adjusted, and Defendants have refused, requiring Plaintiff to produce documents to which she has no legal right.

285.    Defendants are aware of the ages of the children and their adoption status and continue to charge Plaintiff the same amount of child-support.

286.    Defendants have not made support payments for five of the six children in foster care in years, but continue to charge Plaintiff child-support that can only be justified if it is directed towards the care of those children.

287.    Defendants' continued enforcement of Plaintiff's child-support order is illegal.

## REQUESTED RELIEF

WHEREFORE, Plaintiff requests that the Court issue the following relief:

a.    A declaratory judgment that Defendants' policies, practices, acts, and/or omissions as described herein are unlawful and violate Plaintiff's and Class Members' rights under the Constitution and laws of the United States;

b.    An order and judgment preliminarily and permanently enjoining Defendants, their subordinates, agents, employees, representatives, and all others acting or purporting to act in concert with them or on their behalf from enforcing child-support orders under the pre-August 2024 policy;

c.    An order and judgment preliminarily and permanently ordering Defendants to apply the August 2024 policy to all individuals with

child-support orders or children in foster care;

d.    An order and judgment preliminarily and permanently enjoining Defendants from charging child-support where children have reached the age of majority or been adopted;

e.    An order for damages compensating Plaintiff (and class members) for the money Defendants have erroneously deprived through Defendants' failure to adjust child-support and adequately consider ability to pay;

f.    An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems proper.

Respectfully submitted,

*/s/ Phil Telfeyan*
Phil Telfeyan*
Caroline McCance*
Lily Milwit*
Equal Justice Under Law
400 7th St. NW, Suite 602
Washington, DC 20004
(202) 505-2058
ptelfeyan@equaljusticeunderlaw.org
*petition to appear pro hac vice forthcoming*

*/s/ Darice Good*
Darice Good (Bar No. 300535)
Good Legal Firm, LLC
2300 Holcomb Bridge Road, Suite 103
Roswell, Georgia 30076
(404) 234-5475
darice@goodlegalfirm.com

## **<u>Exhibit List</u>**

Exhibit 1 ……………………………………… Declaration of Annalinda Martinez

Exhibit 2 ………………………Cobb County Juvenile Court Order, Petition for

dependency; referral for service providers; notice

of case plan requirements (January 25, 2018)

Exhibit 3 …………………… Georgia Child Support Worksheet (October 21, 2019)

Exhibit 4 ……………….. Order for Paternity and Child Support (October 28, 2019)

Exhibit 5 ………………………… DCSS Delinquency Notification (July 12, 2024)

Exhibit 6 …………………………… DCSS Enforcement Letter (October 20, 2024)

Exhibit 7 ………………………………… Request for Modification Submitted by

Annalinda Martinez (October 3, 2024)